So Ordered.

Dated: September 11, 2023



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Thomas J McGill,                           Case No. 22-21547-gmh

                Debtor.                                   Chapter 7

Lorraine I Ruck,

                Plaintiff,

v.                                       Adv. Proc. No. 22-02074-gmh

Thomas J McGill,

                Defendant.

**OPINION AND ORDER**

Lorraine Ruck hired Thomas McGill to build her a house. Although Ruck paid McGill more than $60,000, he didn't finish the job. After McGill petitioned for bankruptcy under chapter 7 of the Bankruptcy Code, Ruck commenced this adversary

proceeding against McGill seeking an award of damages for "theft by contractor" under Wisconsin Statutes section 779.02(5) and a declaration that McGill's debt is one for defalcation by a fiduciary that is not dischargeable under §523(a)(4) of the Bankruptcy Code. 11 U.S.C. §523(a)(4). The parties tried their dispute to the court, and this opinion states the court's findings of fact and conclusions of law.[1] See Fed. R. Civ. P. 52 (incorporated into these proceedings by Fed. R. Bankr. P. 7052).

To adjudicate the parties' dispute, the court must first determine whether Ruck has proved that McGill owes her a debt, and, if she has, then the court must determine whether she has proved that some or all of that debt is for defalcation by a fiduciary that is not dischargeable under 11 U.S.C. §523(a)(4).

I

After the parties presented closing argument, the court entered an order concluding that the parties had narrowed several issues at trial, including that "[t]he sole basis asserted by the plaintiff for the defendant's alleged debt to her is theft by contractor in violation of Wisconsin Statutes section 779.02(5), for which she seeks an award of damages."[2] ECF No. 39, at 2. Wisconsin's theft by contractor statute, section

---

[1] The "determination[ ] as to the dischargeability of particular debts" is a core matter under 28 U.S.C. §157(b)(2)(I). This court has jurisdiction and the authority to enter a final judgment of nondischargeability and for damages pursuant to 28 U.S.C. §§ 157(b), (c)(2) and 1334, and the district court's standing order referring all bankruptcy-related matters to this court. Ruck consented to this court's entry of a final order, and McGill forfeited any right to have a district court judge finally adjudicate damages by not addressing that issue in his responsive pleadings, as required by this court's rules. See Bankr. E.D. Wis. L.R. 7012; see also ECF No. 4, at 2 and ECF No. 7.

[2] Even though the court concluded after closing argument that plaintiff's sole basis for damages was section 779.02(5), plaintiff's post-trial brief states that she "requests a money judgment, attorney fees, and costs due to the violation of section 779.02(5) pursuant to sections 943 and 846.446 [*sic*]" and she asserts that "[u]pon a showing of Theft by Contractor Plaintiff can request actual damages as the violation falls under Wis. Stat. §§ 943 and 895.446 for civil theft." ECF No. 41, at 2-3. Plaintiff initially cites to section "846.446", but there is no such section; the plaintiff is presumably requesting relief under section 895.446, to which her post-trial brief later refers. See *Id*. at 2-3 & 16. Thus, the court construes plaintiff's post-trial brief as seeking an award under section 895.446 as well as section 779.02(5) of the Wisconsin Statutes. Plaintiff's request for damages, attorney's fees, or treble damages pursuant to section 895.446 is denied for the reasons stated in part III of this opinion.

779.02(5), Wis. Stat., provides, as relevant here and with added emphasis, that:

> **[A]ll moneys paid to any prime contractor** . . . **by any owner for improvements, constitute a trust fund** only in the hands of the prime contractor . . . to the amount of all claims due or to become due or owing from the prime contractor . . . **for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid** . . . . **The use of any such moneys by any prime contractor** . . . **for any other purpose** until all claims . . . have been paid in full or proportionally in cases of a deficiency, **is theft by the prime contractor** . . . of moneys so misappropriated and is punishable under s. 943.20. . . . Except as provided in this subsection, this section does not create a civil cause of action against any person other than the prime contractor . . . to whom such moneys are paid.

To recover for theft by contractor, Ruck bears the burden of proving "the following elements by a preponderance of the evidence:" (1) that McGill entered into an agreement with Ruck to construct her home; (2) that Ruck paid McGill money to construct the home; (3) that McGill "intentionally used part or all of the money for purposes other than the payment of bona fide claims due or to become due for labor or materials used in the improvements prior to the payment of such claims"; (4) McGill's "use of the money was without [Ruck's] consent . . . and contrary to [McGill's] authority"; and (5) Ruck "suffered a monetary loss as a result of [McGill's] use of the money." *Soria v. Classic Custom Homes of Waunakee, Inc.*, 2019 WI App 48, ¶39 (2019) (unpublished decision) (citing to WIS JI–CIVIL 2722); see also *Tri-Tech Corp. of Am. v. Americomp Servs., Inc.*, 646 N.W.2d 822, 828-29 (Wis. 2002) (similarly listing the elements of proof for a violation of section 779.02(5) along with the additional requirements for criminal theft by contractor required by section 943.20(1)(b)); *Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 21–26 (2000) (Unless the Bankruptcy Code otherwise provides, burdens of proof follow the non-bankruptcy law giving rise to claims against the debtor.).

A

As mentioned at the outset, McGill entered into an agreement with Ruck to construct her home, and Ruck and McGill agree that, after accounting for a refund, Ruck paid McGill a total of $60,398 for the project. Exs. 5, 8, & 102; ECF Nos. 19, 30, 35 & 42, at 2-3. McGill concedes that he deposited most of the payments he received from Ruck into his general operating account, which he used for personal expenses and other jobs.[3] McGill's own testimony showed that out of the initial $16,888 Ruck paid him in November 2021 McGill paid personal living expenses and other expenses not related to Ruck's project. Ex. 105, ECF No. 22. McGill does not dispute that he used Ruck's funds for purposes other than completing Ruck's project, contrary to the duty imposed by section 779.02(5), Wis. Stat.

Ruck's testimony established that she did not consent to McGill's use of her funds for personal expenses or on other projects. And Ruck's proof, largely if not entirely uncontested, establishes the first four elements of her theft-by-contractor claim—indeed, McGill's post-trial brief does not develop an argument to the contrary.

McGill focuses on the claim's fifth element—whether Ruck demonstrated that McGill's misuse of the funds harmed her. McGill contends that Ruck suffered no monetary loss because he paid as much, in fact more, for the materials and labor on Ruck's project than Ruck paid him; so, McGill argues, even though there is no evidence that allows one to trace the use of Ruck's funds through McGill's commingled operating account, Ruck has not proven an injury because she received goods and services at least equal in amount to the funds she paid McGill. ECF No. 42, at 2–3 (citing to Ex. 102, ECF No. 19). Ruck does not challenge this theory, only its application.

---

[3] McGill testified that when he deposited two of Ruck's payments, he took a small amount of the funds in cash on the day of the deposit. See Ex. 105, ECF No. 22, at 8 (November 2021 draw check was for $16,888, and McGill withdrew $388 in cash when depositing the check); see also Ex. 105, ECF No. 22, at 61 (July 2021 draw check was for $9,710, and McGill withdrew $210 in cash when depositing the check).

To demonstrate that Ruck received at least as much as she paid him, McGill prepared an accounting of funds used on Ruck's project, which was admitted into evidence as exhibit 102. ECF Nos. 19 & 38. Exhibit 102 lists nine general categories of goods and services for which McGill claims to have used Ruck's funds. McGill contends that while he received $60,398 from Ruck, he paid $63,739.68 for goods and services devoted to her project—$3,341.68 more than Ruck paid him. Ruck, relying in part on the testimony of her construction expert, Kent Fish, contends she proved that out of the $60,398 she paid McGill, she has demonstrated a monetary loss of $22,713.09—funds she provided to McGill that cannot be traced or equated to expenditures related to her project. ECF No. 41, at 16. Ruck makes this argument by challenging the accuracy of McGill's accounting for (1) material purchases, (2) excavating expenses, and (3) labor costs.

B

*Charges for materials.* One of the nine general categories of goods and services McGill lists in his accounting, exhibit 102, is a category labeled "all other building materials". Ex. 102, ECF No. 19 (capitalization altered from original). The accounting attributes expenditures of $24,078.84 to this catch-all expense category. *Id.* McGill testified that the amount is supported by the receipts for building materials that are contained in exhibit 103 (a group exhibit of invoices and receipts) and are not otherwise specifically itemized in one of exhibit 102's eight other general categories. McGill further testified that the way he kept track of costs for his projects was to contemporaneously write the name of the project on the back of each receipt and place the receipt in a folder or envelope for that job—a procedure he employed on Ruck's project—and he knew that the receipts for materials contained in exhibit 103 were for Ruck's project because they are the receipts that he put in the corresponding folder.

Kent Fish, who testified on Ruck's behalf, countered McGill's evidence that he spent $24,078.84 on building materials used in Ruck's project.[4] Fish inspected Ruck's project on September 5, 2021, soon after McGill stopped working on it, and re-visited the site a few weeks before testifying at trial. Ex. 6, ECF No. 31, at 3. He also reviewed the invoices and receipts contained in exhibit 103. Fish identified two sets of issues with the invoices and receipts in exhibit 103. He opined that (1) in some instances the number of materials purchased vastly exceeded the number needed for Ruck's project ("Overpurchased Materials") and (2) some receipts were for materials that weren't used on the project at all ("Unnecessary Materials").

*Overpurchased Materials*: Fish explained that Ruck's project was completed to a point where exterior studs, interior studs, and lineal studs were installed at the project, and McGill's purchase of those materials was supported by a Menards receipt. See Ex. 103, ECF No. 20, at 5. Fish testified, however, that the number of studs shown on that Menards receipt exceeded the number needed or used based on the dimensions of Ruck's project.

Fish's testimony was credible, and McGill did not offer a persuasive rebuttal. In his post-trial brief, McGill counters only that "[t]his appears to be in the nature of a dispute between two different professionals as to what is required to properly complete a construction project." ECF No. 42, at 4. Perhaps so, but of these two professionals, Fish was more convincing. He personally inspected the project site in September 2021,

---

[4] Fish is a licensed building inspector and general contractor with degrees in civil and structural engineering. He is the owner of, and general contractor at, Fish Construction LLC, which builds homes and has been in business since 1992. He is also a senior vice president at General Engineering Company—a Wisconsin building inspection company—where he has worked for 31 years and currently heads the structural engineering department. Fish has been personally involved with building over 150 homes and has been working in the construction industry for decades. He has also worked for lumber yards and has provided over 1,000 material estimates for new-home construction projects. Additionally, he has performed inspections on residential and commercial real estate projects, and, at the time McGill was working on Ruck's project, Fish was building a house nearby using one of the same materials suppliers, the local Menards.

shortly after McGill stopped working on it. Based on his inspection and experience, Fish credibly testified that studs McGill purchased for $2,853.23 were neither used on nor needed for Ruck's project. Based on Fish's testimony, Ruck persuasively proved McGill's accounting for materials was overstated by the cost of the Overpurchased Materials, calculated as shown in the following chart:

| Type of Stud | Amount Purchased | Amount Fish testified was unnecessary | Cost per Stud | Sales Tax[5] | Total |
|---|---|---|---|---|---|
| Exterior Studs | 200 | 62 | $17.99 | 5.5% | $1,176.73 |
| Interior Studs | 200 | 65 | $12.49 | 5.5% | $856.50 |
| Lineal Studs | 60 | 25 | $31.09 | 5.5% | $820.00 |

*Unnecessary Materials.* Fish also identified numerous receipts in McGill's accounting for the project (exhibit 103) that are for building materials and supplies that were not used on Ruck's project at all, including two windows that were not present when Fish inspected the project in September 2021, as well as miscellaneous items such as finishing materials, box-car siding, and packing tape.[6] Fish also testified that copies

---

[5] The sales tax is shown on the corresponding receipt for the lineal studs. See Ex. 103, ECF No. 20, at 5.

[6] McGill concedes that no evidence at trial contradicts Fish's conclusion that the finishing materials, box-car siding, and packing tape were not used for Ruck's project. ECF No. 42, at 5–6. With respect to the missing windows, McGill does not dispute that the windows were not used on the project—indeed, he testified that, except for egress windows, there were no windows at the project when he was last there. McGill instead argues that the window purchases are immaterial because "[McGill] used rebates from prior shopping trips to pay for said windows" and that he had no obligation to "use all rebates received for a construction project on that same construction project." ECF No. 42, at 4. Whatever the proper accounting for the use of rebates might be in another context, here *it is McGill* who presented the receipts for building materials in exhibit 103, including the receipt for windows, to show that Ruck suffered no monetary loss because he spent an amount on Ruck's project equal to the funds Ruck advanced to him, including $24,078.84 for "all other building materials". Removing rebate-funded purchases (such as the windows) in calculating McGill's total expenditures on the project requires a finding that McGill spent less on the project and that Ruck's monetary loss was even greater.

of certain receipts were obscured and contain no description of the materials purchased; thus he could not determine whether the claimed purchases related to Ruck's project.[7] Examining the receipts in exhibit 103 and crediting Fish's testimony over McGill's assertion that all receipts he included in his accounting related to Ruck's project, the court finds that McGill's accounting improperly attributes the following amounts to Ruck's project.

| Materials | Amount attributed to purchase in Ex. 103 |
| --- | --- |
| Windows (Ex. 103, at 7) | $932.20 |
| Finishing materials (Holliday True Value Hardware) (Ex. 103, at 17) | $107.24 |
| Packing Tape (Ex. 103, at 24) | $31.29 |
| Receipts without a description (Ex. 103, at 12–16; 19–20; 25–29). | $1,457.98 |
| Box Car Siding (Ex. 103, at 21) | $35.76 ($33.90 plus 5.5% sales tax[8]) |
| Total | $2,564.47 |

---

[7] With respect to the receipts that are obscured and contain no description of the materials purchased, McGill's post-trial brief concedes that "[n]othing in the record can demonstrate what these items are" and argues that "[t]he only testimony we . . . have . . . is [McGill's testimony about] his practice of writing the name of the job on the back of the receipt, and then placing the receipt in a folder for that job." ECF No. 42, at 5. McGill testified that the receipts that were illegible must have been used on Ruck's project because that was the only project he was working on at the time. The court does not credit that testimony: First, McGill testified that he *was* working on other smaller jobs during at least part of the relevant time, and, second, his demeanor when testifying about his decision to include amounts shown on the illegible receipts as expenditures on Ruck's job rendered that testimony unconvincing.

[8] Ruck identified the charge of $33.90 and the court added 5.5% sales tax to this amount, as shown on the receipts submitted by McGill. ECF No. 41, at 14. Except for the window charges, which were paid for with rebates and did not incur sales tax, all of the other items listed in this chart include sales tax in the total.

C

*Excavating charges.* Ruck argues that she has also showed monetary losses of $3,500 corresponding to an amount McGill attributes to paying Hintz Excavating, the project's excavator. Ruck argues that McGill can't claim to have paid the excavating charges because McGill "did not produce an invoice marked 'paid' by Hintz Excavating for the sum of $3,500 that he claimed to have made for [Ruck's] project for services related to backfill and grading." ECF No. 41, at 14–15.

The evidence, however, demonstrates that McGill paid Hintz for services rendered on the project. McGill testified that he used $7,000 of Ruck's funds to pay Hintz and exhibits 103 and 104 corroborate his testimony. Exhibit 103 contains an April 6, 2021 "estimate" from Hintz with the notation "Loraine project" and "Oxford Wisconsin". ECF No. 20, at 3. The estimate states that $3,500 had already been paid to dig Lorraine Ruck's basement and that an additional $3,500 was due for the following future work: "backfill and grade site" and "bury water line". *Id*. Exhibit 104 contains two canceled checks written by McGill to Hintz—one dated May 13, 2021, for $3,000 and one dated May 17, 2021, for $500—both stating, "Ruck" in the memo area. ECF No. 21, at 1 & 3. Based on this evidence and McGill's testimony, the court finds that McGill paid Hintz a total of $7,000 for services rendered in connection with Ruck's project.

D

*Labor expenditures.* Ruck also contends that McGill's accounting is overstated by the entire amount he attributes to paying for labor on the project, stating, "the Debtor has no detailed records regarding the amount of hours each person worked on the project, the hourly wage he paid to each person, or the specific dates they worked at the Plaintiff's project." ECF No. 41, at 15. Based on this "lack of records", Ruck "assert[s] that the full amount of $13,840 that [McGill] claims to [have paid] in wages be reimbursed to [her] . . . ." *Id.* Alternatively, Ruck argues that "any wages . . . [McGill] paid after July 31, 2021" cannot be attributed to her project because Ruck, who lived in

an on-site camper during the construction, did not see any laborers after they installed the roof around the third or fourth week of July 2021. *Id*. Minimally, says Ruck, McGill has overstated wages spent on the project by $5,677. *Id.*

Ruck is correct that McGill did not produce expense records showing all wages he paid for work on Ruck's project. Indeed, McGill testified that he didn't keep such records. But McGill testified that exhibit 104 contains checks to support his payment of project-related wages. And McGill unquestionably incurred project-related work expenses. McGill and Ruck both testified about work performed on the project—everyone agrees that the house's walls and roof were constructed by July 2021. The evidence establishes that Dean Brumm and Blayne Trout assisted McGill on the project, and exhibit 104 contains copies of checks that McGill used to pay them for that work. Consequently, Ruck failed to prove a monetary loss in the full amount McGill attributes to labor expense.

But McGill's contention that he paid $13,840 in labor costs is unsupported by the record. The copies of checks contained in exhibit 104 made payable to Brumm and Trout total $13,015, and McGill identified no other support for his contention that labor costs totaled $13,840. Therefore, the court finds that McGill's accounting overstated his expenditures on labor by at least $825.

Additionally, Ruck's credible testimony established that McGill didn't pay laborers for work performed on the project after July 2021. McGill's contrary testimony was uncertain, inconsistent, and unreliable.[9] Considering the testimony and the related

---

[9] McGill initially testified that work on the project ended in late August 2021 with the installation of the roof trusses. After reviewing the invoices from Ideal Crane Rental, Inc., in exhibit 103, however, he testified that the trusses and related roof work were completed in July 2021. ECF No. 20 at 1 & 4. After acknowledging that the roof work was completed in July, rather than August, he then testified that he worked on the project for another week or two after the roof was on, and that there was unspecified work done in September. But McGill did not convincingly link this claimed work to payment of project wages, conceding during his testimony that checks included in exhibit 104 that he drafted in October are not related to Ruck's project and their inclusion in exhibit 104 was a mistake.

exhibits, the court finds that checks McGill wrote to laborers after July 2021 were not for work performed on Ruck's project, with the following caveat: based in part on McGill's testimony that he paid his employees on Fridays, the court finds that the August 6, 2021 checks he wrote to Blayne Trent for $360 and Dean Brumm for $760 were for work performed in July on Ruck's project. ECF No. 21, at 7. The other post-July 2021 checks McGill claimed to be project-related, totaling $4,557, were not payments for work done on Ruck's project. *Id.* at 8-9.

The court finds that McGill's actual project-related labor costs are $8,458 (total checks of $13,015 less non-project-related checks of $4,557) and that McGill's accounting overstated that amount by $5,382.

E

Considering the proven shortcomings in McGill's accounting for amounts he claims to have spent on Ruck's project, the court finds Ruck suffered a $7,458.02 loss, calculated as follows:

| Damages Category | Amount |
| --- | --- |
| Overpurchased Materials (Exterior Studs, Interior Studs, and Lineal Studs) | $2,853.23 |
| Unnecessary Materials (Missing Windows, finishing materials, box car siding, packing tape) | $2,564.47 |
| Labor overcharged | $5,382.00 |
| Less the amount that McGill paid out of pocket after accounting for payments from Ruck | ($3,341.68) |
| Total Losses | $7,458.02 |

This calculation of Ruck's loss follows the parties' presentations by focusing on the extent to which McGill's accounting overstates the amount he spent on Ruck's project. McGill's accounting presumes that he expended $63,739.68 on Ruck's project, which is $3,341.68 more than Ruck paid him ($60,398); so, Ruck's loss is calculated by subtracting

$3,341.68 from $10,799.70 (the amount by which Ruck proved McGill overstated the expenses on her project) to arrive at the total amount of damages of $7,458.02. A perhaps more intuitive path to the same result begins by calculating the amount that McGill actually spent on the project. That amount is obtained by subtracting the amount by which McGill's accounting overstates expenses ($10,799.70) from his total expense amount ($63,739.68), yielding actual expenses of $52,939.98. Ruck's loss is equal to the amount she paid ($60,398) less McGill's actual project-related expenses ($52,939.98): $7,458.02.

II

Ruck has demonstrated that McGill owes her a debt— a right to recover damages from McGill under Wisconsin's theft-by-contractor statute—at least equal to her $7,458.02 loss (as discussed below, she also claims a right to recover additional amounts based on McGill's theft-by-contractor).[10] To obtain a declaration that the debt McGill owes her is not dischargeable under 11 U.S.C. §523(a)(4), she must prove that the debt is "for . . . defalcation while acting in a fiduciary capacity".

McGill does not dispute that he was "acting in a fiduciary capacity" for purposes of §523(a)(4), and he has waived any contrary argument. ECF Nos. 39, at 2 & 42, at 2. McGill's post-trial brief concedes that he understood that he was acting as a fiduciary, stating: "To simplify matters, the Defendant has never argued that as the contractor in this matter, he was not acting as a fiduciary. His description of his practice of labeling receipts and maintaining them in separate folders as his accounting method for the different jobs he had demonstrates such an understanding." ECF No. 42, at 2.

Defalcation, the Supreme Court has instructed, requires conduct undertaken with wrongful intent, with a "state of mind . . . involving knowledge of, or gross

---

[10] "Debt," as used in §523(a)(4) and elsewhere in the Bankruptcy Code, "means liability on a claim", §101(12), and, as relevant here, "'claim' means . . . [a] right to payment", §101(5)(A).

recklessness in respect to, the improper nature of the relevant fiduciary behavior", and, unless "the conduct at issue . . . involve[s] bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 & 273 (2013). There is no evidence that McGill's conduct was in bad faith, immoral, or otherwise nefarious. That leaves Ruck to prove that McGill knew his conduct was improper or that he engaged in conduct while recklessly ignoring its potential illegality. *Id*. at 273–74.

Ruck's counsel conceded at closing argument that Ruck did not prove that McGill knew his conduct was improper; rather, Ruck's argument is that McGill recklessly ignored the likelihood that his conduct violated a fiduciary duty. As the Supreme Court has explained, "[w]here actual knowledge of wrongdoing is lacking, [the court] consider[s] conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* at 274 (quoting ALI, Model Penal Code §2.02(2)(c), p. 226 (1985)). The "risk 'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'" *Id.* (quoting ALI, Model Penal Code §2.02(2)(c), at 226)).

Again, McGill's post-trial brief acknowledges his understanding that he was required to act as a fiduciary of Ruck's funds. ECF No. 42, at 2. As explained above, McGill violated Wisconsin's theft-by-contractor statute when he deposited (most of) Ruck's funds into a general account that he used indiscriminately to pay business and personal expenses and then failed to use funds in the amount Ruck paid him to construct her home. Ruck asks the court to infer that McGill recklessly ignored the potential illegality of his conduct because McGill, a sole proprietor in the home-building business and a licensed contractor for more than twenty years, commingled funds in his

operating account, used part of Ruck's first payment to him for various purposes other than Ruck's project, and failed to properly account for her funds. ECF No. 41, at 5, 8-9 & 11.

McGill's understanding of the requirement to act as a fiduciary combined with the way he maintained the funds and kept only casual accounting records shows a reckless indifference to his fiduciary duties that amounts to defalcation. He deposited the funds in his general operating account without providing for a method of segregating the funds or providing an accurate accounting for them. And, although he testified to "his practice of labeling receipts and maintaining them in separate folders as his accounting method for the different jobs he had", this method of accounting failed to provide a reliable accounting of his use of the funds; indeed, as explained above, it resulted in the inclusion of expenses and costs that were not related to the project. ECF No. 42, at 2. By failing to properly account for funds deposited into a general account used indiscriminately for personal and business expenses, he "'consciously disregard[ed]' . . . 'a substantial and unjustifiable risk'", *Bullock*, 569 U.S. at 274 (quoting ALI, Model Penal Code §2.02(2)(c), p. 226 (1985)), that he would violate his fiduciary duty to hold the funds paid to him in trust as required by Wisconsin Statutes section 779.02(5) until "all claims due or to become due or owing from the prime contractor . . . for labor, services, materials, plans, and specifications used for the improvements . . . have been paid." As a result, Ruck has shown that the $7,458.02 debt McGill owes her is one for defalcation while acting as a fiduciary within the meaning of §523(a)(4) of the Bankruptcy Code.

III

Ruck's amended complaint requests an award of attorney's fees and costs and treble damages, in addition to actual damages. ECF No. 4, at 5. At closing argument, however, Ruck relied solely on Wisconsin Statutes section 779.02(5) as the source of her right to relief, and that section does not authorize awards of attorney's fees or treble

damages. As mentioned above, after the parties' closing arguments, the court observed that "the parties have narrowed the issues" and directed that "[t]he sole basis asserted by the plaintiff for the defendant's alleged debt to her is theft by contractor in violation of Wisconsin Statutes section 779.02(5), for which she seeks an award of damages." ECF No. 39, at 2. The court then ordered Ruck to file a post-trial brief "that, at a minimum, states each of the claims for which she seeks relief, the type of relief sought with respect to each claim, and the legal basis for each claim . . . ." *Id.* at 3.

Ruck filed two post-trial briefs, and while she did not address treble damages, she did argue that she was entitled to an award of damages and attorney's fees and costs pursuant to Wisconsin Statutes section 895.446.[11] Ruck suggests that an award of attorney's fees follows as a matter of course from proof of theft-by-contactor; she states: "[u]pon a showing of Theft by Contractor Plaintiff can request actual damages as the violation falls under Wis. Stat. §§ 943 and 895.466 for civil theft" and "a violation of Section 779.02(5) . . . permits the Plaintiff to request remedies under Section 895.446(3)(b) . . . due to the reference to Section 943.20 if a violation of Section 779.02(5) is determined." ECF No. 41, at 3 & 16 (citing *Estate of Miller v. Storey*, 903 N.W.2d 759 (Wis. 2017)).

Ruck is correct that section 895.446 provides a basis for awarding attorney's fees. The Wisconsin Supreme Court has held that "attorney fees are included within the

---

[11] The parties have not addressed whether Wisconsin law affords a claim for damages under section 779.02(5) separate and apart from a claim for damages, treble damages, or attorney's fees under section 895.446. Section 779.02(5)'s text does not explicitly contain a civil claim for damages but the language of the statute suggests such a claim, stating "Except as provided in this subsection, **this section does not create a civil cause of action against any person other than the prime contractor . . . to whom such moneys are paid**." (emphasis added). The Wisconsin Supreme Court characterized an action for damages for violation of an earlier theft-by-contractor statute as one "for the conversion of the trust funds". *Burmeister Woodwork Co., Inc. v. Friedel*, 222 N.W.2d 647, 652 (Wis. 1974) (discussing Wis. Stat. §289.02(5) (1971)). Resolving this issue is beyond this opinion's scope: By defending against Ruck's theft-by-contractor claim only by arguing that he used all of Ruck's funds on her project, McGill has waived any argument that Ruck's proof otherwise failed to prove a debt owed for theft-by-contractor under Wisconsin law.

meaning of 'costs of investigation and litigation' [recoverable] under Wis. Stat. § 895.446(3)(b)". *Miller*, 903 N.W.2d at 771; see also *Rodriguez v. Expert Home Exteriors, LLC*, No. 22-cv-0223, 2023 WL 2326339, at *5 (E.D. Wis. Feb. 21, 2023). But Ruck's suggestion that the remedies provided by section 895.446 *must* be awarded for *all* violations of section 779.02(5) is incorrect. Section 895.446 provides, in relevant part, that one "who suffers damage or loss *by reason of intentional conduct . . . that is prohibited under . . . [§]943.20* . . . has a cause of action against the person who caused the damage or loss" for actual damages, "[e]xemplary damages of not more than [three] times the amount [of actual damages] awarded", and "[a]ll costs of investigation and litigation that were reasonably incurred" by the plaintiff. Wis. Stat. §895.446(1) & (3) (emphasis added). In the context of a plaintiff seeking treble damages under a former version of section 895.446 for "civil theft by contractor under Wis. Stat. §779.02(5)", the Wisconsin Supreme Court in *Tri-Tech Corp.* held that a plaintiff is entitled to those damages under section 895.446 only if the plaintiff proves "the elements of both the civil *and* the criminal statutes. . . . Stated differently, the basis of liability for criminal theft by contractor is a violation of the trust funds provisions of Wis. Stat. § 779.02(5), plus the criminal intent required by Wis. Stat. § 943.20(1)(b)." *Tri-Tech*, 646 N.W.2d at 828.[12] The elements of a criminal theft-by-contractor offense require proof of the civil elements

---

[12] *Tri-Tech* explained this conclusion as follows:

> By its terms, Wis. Stat. § 779.02(5) makes misappropriation of contractor trust funds punishable as a theft under Wis. Stat. § 943.20. Wisconsin Statute § 895.80 [now Wis. Stat. §895.446], which provides a civil treble damages remedy to victims of certain intentional property crimes, includes Wis. Stat. § 943.20 as one of the predicate criminal offenses for which the remedy is available. The elements of criminal theft by contractor under Wis. Stat. §§ 943.20(1)(b) and 779.02(5) include specific criminal intent, to-wit, that the defendant knowingly retained possession of or used contractor trust funds without the owner's consent, contrary to his authority, and with intent to convert such funds for his own use or the use of another.

*Tri-Tech*, 646 N.W.2d at 824 (citing to Wis. Stat. §895.80, which was renumbered to Wis. Stat. §895.446 and had its title amended by 2005 Act 155, §70, eff. Apr. 5, 2006).

required by §779.02(5), which are discussed above, *plus* proof "that the defendant knowingly retained, concealed, or used contractor trust funds without the owner's consent, contrary to his authority, and with intent to convert such funds to his own use or the use of another." *Id.* at 829 (quoting *State v. Hess*, 298 N.W.2d 111, 114 (Wis. App. 1980)). *Tri-Tech* thus makes clear that to obtain any of the remedies provided in section §895.446(3), including attorney's fees and treble damages, Ruck must prove that McGill used Ruck's funds "with intent to convert [the funds] to his . . . own use or to the use of any other person except" Ruck. Wis. Stat. §943.20(1)(b).

Ruck failed to prove criminal intent because she did not prove that McGill intended to convert her funds to his own use. The evidence established that McGill mismanaged Ruck's funds by using a general operating account and employing poor accounting methods, and that this mismanagement resulted in him using less than the full amount Ruck provided on her project, but it did not show that McGill intended to convert Ruck's funds for his own use. Put differently, Ruck's loss was proven to be the result of McGill's poor business practices, rather than a purposeful effort to make her funds his own.[13]

Additionally, Ruck did not address proof of criminal intent in her closing argument or post-trial briefs. By failing to do so she forfeited any argument that she proved that element.

---

[13] Ruck did not argue that McGill's recklessness in handling her funds might satisfy section 943.20(1)(b)'s intent element; as explained in the text, she did not address the criminal intent element at all, thus forfeiting all such arguments. Notably, the basis for concluding that McGill's debt is for defalcation is McGill's acknowledgement that he was aware of his fiduciary duties in connection with Ruck's funds and maintained and accounted for those funds in a way that was (at least) recklessly contrary to those duties. McGill's recklessness in failing to meet his legal duties that governed his use and maintenance of Ruck's funds is a substitute for proof that he intentionally maintained and used the funds in a manner contrary to his known legal duties. Perhaps McGill's recklessness in the use of funds could also amount to a showing that he "inten[ded] to convert [Ruck's funds] to his . . . own use or to the use of any other person" for purposes of section 943.20(1)(b)—that is, perhaps his recklessness could also be a substitute for proof that he intentionally used the money for his own use or for the use of persons other than Ruck. But, again, Ruck has forfeited this issue, so this opinion leaves that question unresolved.

For these reasons, Ruck has not met her burden to prove that she is entitled to an award of attorney's fees or treble damages under section 895.466.

## ORDER

Based on the reasons set out in the foregoing opinion, the court hereby orders:

1. Plaintiff Lorraine Ruck is entitled to a money judgment against Thomas J. McGill in the amount of $7,458.02 and a declaratory judgment that the monetary award is not dischargeable pursuant to 11 U.S.C. §523(a)(4).

2. The clerk of court is instructed to enter judgment accordingly.

# # # # #